893 F.2d 629
 Candida A. WILTSHIRE, a minor by Camaleta WILTSHIRE and
Randolph Wiltshire, her Parents and Next of
Friends and Camaleta Wiltshire and
Randolph Wiltshire, Ind., Appellants,
v.
GOVERNMENT OF The VIRGIN ISLANDS, Several Unknown Persons.
 No. 89-3164.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 5, 1989.
Decided Jan. 12, 1990.
Rehearing and Rehearing In Banc Denied Feb. 16, 1990.
 
 Frank M. McClellan (argued), Eaton, McClellan & Allen, Philadelphia, Pa., W. David Allen, Allen T. Eaton, David T. Smorodin, Eaton, McClellan & Allen, Washington, D.C., for appellants.
 R. Eric Moore (argued), Law Offices of R. Eric Moore, Christiansted, St. Croix, U.S. Virgin Islands, for appellee.
 Before GIBBONS, Chief Judge, MANSMANN and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 This matter comes to us on appeal from a final order of the district court for the District of the Virgin Islands limiting a minor's recovery in a medical malpractice action to $250,000. The district court's order also denied consideration of the minor's parents' related claim for loss of services due to lack of subject matter jurisdiction.
 
 
 2
 We agree with the district court that it could not exercise subject matter jurisdiction over the parents' derivative claim. The parents failed to give prior notice of their claim to the Virgin Islands Medical Malpractice Action Review Committee (the "Committee") as required by Sec. 166i of the Health Care Provider Malpractice Act, 27 V.I.C. Secs. 166 et seq. (Equity Supp.1989). Their later untimely attempt to send notice to the Committee does not alter this result.
 
 
 3
 We, however, hold that the district court erred as a matter of law in its construction of the applicable insurance contract. The policy established the extent of liability of the defendant in this action, the government of the Virgin Islands. Inferentially, the insurance contract also describes the boundary of the waiver of sovereign immunity of the government. The district court decided that although the minor was the victim of three separate occurrences of medical malpractice, the policy's language confined her to a "per person" recovery cap of $250,000. We conclude instead that since the minor suffered three separate incidents of medical malpractice, the maximum recovery allowed under the policy consists of three separate awards of $250,000, one for each of the malpractice occurrences, for a total of $750,000. More importantly, the dictates of the relevant statute under which the government consents to be sued in such actions, the Health Care Provider Malpractice Act, permits three individual recoveries for the minor.
 
 
 4
 We will therefore affirm the district court with respect to the parents' claim, but reverse its decision concerning the language of the insurance contract. The order granting damages in the amount of $250,000 will be vacated and judgment will be entered against the defendant in the amount of $750,000.
 
 I.
 
 5
 The following material facts underlying this action are not in dispute:
 
 
 6
 On February 13, 1983, Candida A. Wiltshire was born prematurely to Camaleta and Randolph Wiltshire at the St. Thomas Community Hospital, a facility owned and operated by the government of the Virgin Islands in St. Thomas. At birth Candida weighed four pounds, three and one-half ounces--a weight appropriate for her gestational age of 34-35 weeks. Candida was in relatively good health immediately after her birth.
 
 
 7
 To provide Candida with nutrients and liquids, the treating physicians, employees of the government, arranged to feed her through an umbilical venous catheter (UVC) and a nasogastric (NG) tube. The UVC was additionally used to draw blood from and administer blood to Candida. With extended use of a UVC (greater than 24-48 hours) there is a danger of contracting a serious infection; nonetheless, the UVC remained in place for seven days through February 20, 1983. By this date, Candida began to decline in health. Her physicians described Candida as mildly lethargic with some vomiting and an episode of staring. One physician noted that "infection must be looked for." On February 23, 1983, another doctor wrote: "toxic appearance now last 4-5 days, probably staph aureus or epidermitis [secondary] to UVC."
 
 
 8
 On February 24, 1983, Candida's condition deteriorated rapidly. She experienced an episode of bradycardia (slow pulse rate) and apnea (cessation of breathing). When Candida began gasping for air, the nurses and technicians on duty administered cardiopulmonary resuscitation ("CPR" or "bagging"). A physician noted: "infant apneic probably secondary to blood out--14 cc and sepsis. Bagging being done before my arrival ineffective and probably more destructive to breathing." Blood gas readings taken at this time to evaluate Candida's status indicated a severe infection.
 
 
 9
 Upon the discontinuation of the UVC, the physicians met Candida's nutritional needs by placing a feeding line in her scalp. The solution leaked from the feeding line and the seepage resulted in a disfiguring scar on Candida's forehead and face.
 
 
 10
 Candida was discharged from the hospital on April 5, 1983.
 
 
 11
 The Wiltshires allege that as a result of her treatment, Candida is severely retarded in the development of her mental, motor and speech activities. At five years old, Candida was unable to walk and was incontinent. She had only rudimentary speaking skills and there is a possibility that she is hearing impaired. Candida has been diagnosed as suffering from spastic quadriparesis and a seizure disorder. In addition, Candida has a permanent disfiguring scar on her forehead.
 
 
 12
 Candida and her parents proceeded to institute a medical malpractice action against the individual treating physicians, certain other of the hospital's employees and the government of the Virgin Islands. As required by Sec. 3409(c) of the Virgin Islands Tort Claims Act, 33 V.I.C. Secs. 3401 et seq. (Equity Supp.1989), the Wiltshires filed a notice of tort claim detailing the alleged improper care of Candida after her birth. Then, on July 11, 1983, the Wiltshires filed a proposed complaint with the Review Committee as required by Sec. 166i of the Malpractice Act--a prerequisite to commencing a medical malpractice suit in court. The proposed complaint forwarded to the Committee stated a claim arising out of Candida's facial disfigurement and the emotional distress associated with such scarring. Candida's parents advanced a related claim on their own behalf for loss of Candida's services. The Wiltshires then filed a similar complaint with the district court on April 16, 1984.
 
 
 13
 Three and one-half years later, on December 22, 1987, the Wiltshires moved to amend their original complaint. The amended complaint included, for the first time, two claims for neurological damage to Candida and an additional parents' loss of services claim stemming from the neurological injury incurred by Candida. The district court permitted the amended complaint to be filed. The government filed an amended answer and, also, on May 17, 1988, moved to dismiss the amended complaint. This motion asserted that the amended complaint, alleging neurological damage and describing a parent's claim for loss of services, was invalid as it was never served upon the Committee as required by Sec. 166i of the Malpractice Act. On May 22, 1988, the Wiltshires mailed a copy of the amended complaint to the Committee.
 
 
 14
 On the day that trial was scheduled to commence (October 11, 1988), with the motion to dismiss still outstanding, the parties agreed to settle the dispute. The Wiltshires agreed to resolve Candida's case against the government for the maximum insurance coverage available under the government's medical malpractice insurance policy. Although the parties agreed that the minimum coverage available under the policy was thus $250,000 because of Candida's enormous damages, there was no similar concession as to the upper limit of the amount recoverable. The parties therefore agreed to submit the question of the meaning of the policy to the district court.[1] Also at the settlement conference, the government made clear its position that the parents had no compensable claim.[2]
 
 
 15
 The district court found that three separate occurrences of malpractice were inflicted upon Candida; namely, (1) the negligent placement of the UVC (the seven day duration was unnecessarily lengthy); (2) negligent "bagging"; and (3) negligent placement of the IV in Candida's forehead. Nonetheless, based upon its construction of the relevant policy language, the district court limited Candida's recovery to $250,000. The Wiltshires appealed.
 
 
 16
 There are three issues to be decided. Two of them, the extent to which the government has waived its sovereign immunity in medical malpractice actions and the subject matter jurisdiction of the district court over the Wiltshires' loss of services claim, are issues of statutory construction over which we exercise plenary review.
 
 
 17
 The extent of our review of the third issue, concerning the impact of the language of the insurance contract, involves our construction of a contract. In Ram Construction Company, Inc. v. American States Insurance Company, 749 F.2d 1049 (3d Cir.1984), we determined that in assessing whether a district court was construing a contract, "the focus is whether the court is deciding the legal effect of an agreement on an event not foreseen by the parties." Id. at 1053, citing, 3 CORBIN ON CONTRACTS Sec. 534 (1960). See also STV Engineers, Inc. v. Greiner Engineering, Inc., 861 F.2d 784 (3d Cir.1988) (determining meaning of particular contract term clearly involves construction). "When construction of a contract is the issue before the appellate court, the question is one of law and is freely reviewable." Ram Construction, 749 F.2d at 1053.
 
 
 18
 We are challenged here by the fact that the parties in this matter are not the contracting parties, yet we believe this immaterial concerning our scope of review. This somewhat unusual situation where the parties to the action, who are not the identical parties to the writing under scrutiny, comes about because of the way in which the Wiltshires and the government agreed that the matter was to be decided. The settlement agreement does nothing to alter the delineation of our review power. Our primary concern remains how the district court conducted its analysis of the wording of the policy and it is apparent here that the court was "construing." The drafters of the insurance policy obviously did not foresee the factual scenario presented here in delineating the scope of its liability. To extract from the policy the extent of its coverage when three separate incidents of negligence cause three distinct injuries to one individual thus necessitated the district court's construction of the term "occurrence" in the context of the otherwise limiting language of the policy. The propriety of this construction, dispositive of the rights of the parties, is a question of law subject to plenary review.
 
 II.
 
 19
 The basic question is the extent to which a liability insurer must provide coverage by the terms of its policy for losses its insured incurred in a settlement of a medical malpractice action involving three distinct occurrences of negligent conduct. On agreement by the parties, the district court resolved the matter by looking solely to the language of the insurance contract. However, we are ever mindful that here the insured is an arm of the government of the Virgin Islands. This matter thus is permeated, indeed, is in some ways controlled, by concepts of sovereign immunity. Therefore, although the parties agreed that they would accept the district court's conclusion as to the maximum recovery allowed under the policy, they could only do so to the extent that the government has waived its immunity against suit in such instances by legislative act. Liability of the government here is not premised on the availability of the proceeds of the insurance policy, but exists because under the Act by which the government waives its immunity in malpractice cases, the purchase of insurance is mandated. Kock v. Government of the Virgin Islands, 811 F.2d 240 (3d Cir.1987).
 
 
 20
 We thus begin our discussion by noting that in approaching the question of a waiver of sovereign immunity, both the Supreme Court and our court have made clear that such a waiver will not lightly be inferred. Soriano v. United States, 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); Harris v. Municipality of St. Thomas and St. John, 212 F.2d 323 (3d Cir.1954). If the government of the Virgin Islands is to be held liable in this case, some act of the legislature must satisfy the strict test for waiver of sovereign immunity. The Virgin Islands Tort Claims Act, 33 V.I.C. Secs. 3401 et seq. (Equity Supp.1989), represents the Virgin Islands government's express, limited waiver of sovereign immunity and constitutes the requisite consent of the legislature, see Sec. 2b of the Revised Organic Act of 1954, 48 U.S.C. Sec. 1541(b), for the government to be sued.
 
 
 21
 The Virgin Islands legislature has also enacted a statute further expanding the circumstances under which the government may be sued, the Health Care Provider Malpractice Act. The Malpractice Act established a comprehensive scheme for the regulation of health care providers in the compensation of malpractice victims. Section 166b(a) establishes that the total amount recoverable for any patient "may not exceed two hundred and fifty thousand dollars ($250,000), increasing by two hundred and fifty thousand dollars ($250,000) for each additional patient injured in a single occurrence...." We have read this language of the Malpractice Act as imposing an ultimate limit of $250,000 on medical malpractice recoveries for a single injury of a patient. Kock v. Government of the Virgin Islands, 744 F.2d 997 (3d Cir.1984).
 
 
 22
 The Malpractice Act also authorized the Commissioner of Health to procure a group insurance policy to cover all health care providers. Under Sec. 166e(b)(1), the policy procured by the Commissioner must provide coverage for at least $100,000 per patient per occurrence. Regarding all occurrences, the annual aggregate policy limit is established at an amount of not less than $1,300,000. 27 V.I.C. Sec. 166e(b)(2).
 
 
 23
 Deference to principles of sovereign immunity normally compels us to apply the rule of statutory construction that "limitations and conditions upon which the government consents to be sued must be strictly observed and exceptions thereto are not to be implied." Soriano, 352 U.S. at 276, 77 S.Ct. at 273. In Kock, however, 744 F.2d at 1000, we declined to apply this rule in the Virgin Islands and instead looked to the Revised Organic Act, 48 U.S.C. Sec. 1541(b), for the proper manner of analysis. That section instructs that tort actions shall be brought against the government of the Virgin Islands only by consent of the legislature. Although Sec. 1541(b) by its terms does not require express consent, in Kock we found the requirement of legislative consent satisfied by the mandatory insurance provisions for public hospitals contained in the Malpractice Act. While crediting this indication, we nonetheless remained cognizant that when a court infers legislative consent to be sued, we must proceed judiciously and with due regard for the government's sovereignty.
 
 
 24
 With these principles in mind, we observe that Sec. 166b(a) of the Malpractice Act specifically limits the amount recoverable in a medical malpractice action for any injury of a patient to $250,000 per occurrence. Section 166b(e) then provides that "injury arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of a single occurrence." Resolution of this case thus depends on whether Candida was exposed to a single occurrence, or multiple occurrences of malpractice.
 
 
 25
 As noted, the district court analyzed this matter purely on the language of the policy. After a thorough analysis of the law and commentaries, see Annotation, What Constitutes a Single Accident or Occurrence Within a Liability Policy Limiting Insureds Liability to a Specified Amount Per Occurrence or Accident, 64 A.L.R. 4th 668 (1987), the district court adopted the view of the majority of the courts which looks to the cause or causes of the accident in order to determine whether there are single or multiple occurrences. The district court then decided that this was not a situation in which the injuries were caused by continuous or repeated exposure, but rather arose from three distinct acts/causes of medical malpractice--(1) negligent placement of the UVC; (2) negligent "bagging"; and (3) negligent placement of the IV in Candida's forehead.
 
 
 26
 We agree with the district court's reasoning in reaching its factual conclusion that Candida's injuries did not come about as a result of extended exposure to the same basic condition. Applying the Sec. 166b(e) definition of a single occurrence, "injury arising out of continuous exposure to substantially the same condition," to the facts as found by the district court, we conclude that the Malpractice Act's liability provisions are applied anew with each negligent event. Even if we were to apply the strict construction standard necessary in waiver of immunity cases, this is the only plausible reading of the statute. If by its terms the Malpractice Act took pains to define what a single occurrence is, then we should be true to its delineation. By its plain meaning, the statute allows a maximum $250,000 for each occurrence of malpractice. Our announcement in Kock that the Act imposes a $250,000 limit on recovery, 744 F.2d at 999, does not compel a different result as there we were discussing injury in the singular, and not the plural sense. The unusual factual scenario here where three separate acts of negligence were inflicted upon one person is exactly that--a peculiar circumstance, not an impediment to recovery. Because under the Malpractice Act, the government has consented to be sued to $250,000 per occurrence, Candida would be entitled to a maximum $250,000 recovery for each occurrence, for an ultimate total of $750,000, dependent, of course, upon the coverage purchased by the hospital.
 
 
 27
 Having established that under the Malpractice Act the government has waived its sovereign immunity to a possible maximum of $250,000 per occurrence, we must now determine how Candida is to be compensated under the terms of the insurance policy procured in conformity with Sec. 166e of the Act. Thus, it is now necessary to turn our attention to the district court's construction of the policy.
 
 
 28
 We have already announced our agreement with the district court's application of the facts to the law in deciding that three distinct incidents of malpractice occurred. Where we disagree with the district court is in its construction of the policy's terms regarding Candida's recovery.
 
 
 29
 We look first, as we must, to the language of the policy itself:
 
 LIMITS OF LIABILITY
 
 30
 Any references in this policy or its endorsement to limits of liability are modified to the extent herein set forth: Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain Bodily Injury or, (3) claims made or suits brought on account of Bodily Injury, the company's liability is limited as follows:
 
 
 31
 The limit of the company's liability against such coverage as is afforded by this policy are subject to all the terms of this policy having reference thereto are:
 
 
 32
 $250,000 (two hundred and fifty thousand dollars) per person; $500,000 (five hundred thousand dollars) per occurrence; subject to an absolute annual aggregate of $5,000,000 (five million dollars).
 
 
 33
 The total liability of the company for all damages, including damages for care and loss of services, because of Bodily Injury sustained by one or more persons as a result of any one occurrence shall not exceed the limit of Bodily Injury liability stated above.
 
 
 34
 In analyzing the policy's terms, the district court concluded that the $250,000 "per person" limitation confined Candida's recovery to that amount regardless of the number of malpractice occurrences. The court found this through recomposing the introductory and concluding phrases of the policy to read that "liability per person was limited to $250,000 regardless of the number of claims made or suits brought on account of bodily injury."
 
 
 35
 We cannot accept such a construction of the policy. We agree with the district court that the language of the insurance policy is not ambiguous, therefore, our conclusion in this regard is not as a result of construing its terms in favor of the insured and against the insurer.[3] Rather, we look to the policy as written and not as restructured by the district court. The words "[r]egardless of the number of claims made ..." clearly contemplates a situation where multiple claims arise from one incident of malpractice and does not encompass, as the district court determined, cases of more than one malpractice occurrence. The section of the policy describing the limits of its liability, similar to its companion section in the Malpractice Act, is couched in terms of a singular occurrence of malpractice, i.e., "the total liability for all damages sustained by one or more persons as a result of any one occurrence shall not exceed the limit of Bodily Injury liability stated above" (emphasis added). By our reading, the limits of liability which are described, including the $250,000 "per person" cap, thereby apply to single incidents of malpractice. Despite the fairly straightforward language of the insurance policy, it is apparent that its drafters did not envision nor provide expressly for the unusual situation wherein an insured, in a short period of time, performs three negligent acts upon one individual. We conclude that the policy in such circumstances entitles an injured party to receive $250,000 per single occurrence. As applied to Candida, to be compensated for the three separate occasions of malpractice, the maximum amount available to her under the policy is $750,000.
 
 
 36
 It is disquieting to envision the possible inequities the district court's contrary construction would invoke. We refer to the hypothetical proposed by the Wiltshires, and while noting its hyperbole, find it does pose a perplexing problem. As presented by the Wiltshires, the court's reasoning could lead to a conclusion that patients admitted to a hospital, regardless of the circumstances surrounding their stay, are permitted only one recovery. Thus, a patient injured through administration of a wrong medication, then injured by an improperly performed operation, who is then dropped during transport from the recovery room, could be compensated for these three wrongs but once, merely because the three negligent acts all happened to the same patient. This hypothetical does not seem so farfetched when one considers the events which caused Candida's damages. The unnecessary duration of the UV, the negligent CPR technique and the improper placement of the IV into Candida's forehead track such a situation. The effect of the district court's ruling is that following the first occurrence, Candida became powerless to assert any other claim against the government, no matter how many additional separate and distinct acts of negligence were committed. This is a strained reading of the policy, at odds with the result demanded by its clear provisions.
 
 III.
 
 37
 We now consider whether the parents have preserved any cognizable claim for loss of Candida's services, and if so, whether they are entitled to recover under the terms of the policy.
 
 
 38
 Although the district court determined that all elements supporting the Wiltshires' loss of services claims were forfeited by failure to give statutory notice to the Committee, this was based upon an erroneous factual determination. The district court apparently believed that the original complaint which was served upon the Committee, concerning only Candida's facial disfigurement, did not contain a related claim for the parents' loss of services. This is simply not borne out by the record. Such a claim was indeed advanced. Thus, two claims for loss of services are at issue.
 
 
 39
 We look first to the Wiltshires' request for recovery for loss of services associated with Candida's neurological impairments. This claim was raised, for the first time, in an amended complaint filed nearly three and one-half years after the original complaint.[4] In pursuing this claim, the parents failed to comply with the procedural requirements of Sec. 166i of the Malpractice Act which established the Review Committee. The purpose of the Committee "shall be to arrange for expert review of all malpractice claims before actions based upon such claims are commenced in Court." 27 V.I.C. Sec. 166i(a). Section 166i(b) further provides that:
 
 
 40
 No action against a health care provider may be commenced in court before the claimant's proposed complaint has been filed with the Committee and the Committee has received the expert opinion as required by this section.
 
 
 41
 * * *
 
 
 42
 The proposed amended complaint which first raised the parents' loss of services claims based on neurological impairment was not filed with the Committee within the two-year statute of limitations period established in Sec. 166i(d) of the Act. See also Richardson v. Knud Hansen Memorial Hospital, 744 F.2d 1007 (3d Cir.1984).
 
 
 43
 In Berry v. Curreri, 837 F.2d 623 (3d Cir.1988), we examined the propriety of allowing a plaintiff to raise claims not contained in the original complaint and held that:
 
 
 44
 [A] complaint must be filed with the Committee and the Committee must obtain an expert opinion. The purpose of the Committee '[is] to arrange for an expert review of all malpractice claims before actions based upon such claims are commenced in court....' It is plain, therefore, that the Complaint must set forth a specific claim or claims of malpractice, and that an expert opinion must be obtained on each claim.... In this context, reading section 166i(b) as anything less than a limitation on the subject matter jurisdiction of the District Court would be inconsistent with the overall statutory objectives.
 
 
 45
 Id. at 625-26 (emphasis supplied).
 
 
 46
 We note also that the District Court of the Virgin Islands has stated that in a malpractice action against the Government of the Virgin Islands in its capacity as a health care provider, strict compliance with the provisions of the Act is a condition precedent to the waiver of governmental immunity. See Quinones v. Charles Hardwood Memorial Hospital, 573 F.Supp. 1101, 1104 (D.V.I.1983). Where, as here, the provisions of the Act are ignored, the Committee is deprived of the opportunity to have the newly raised claims damage reviewed by an expert.
 
 
 47
 Based, then, on the plain language of the statute and on Berry, we conclude that the parents' loss of service claims insofar as they relate to neurological impairment are barred, and that the district court was without jurisdiction to consider them.
 
 
 48
 We turn next to the parents' claim for loss of services relating to Candida's disfigurement. As stated, this claim was contained in the Wiltshires' original complaint and was, therefore, properly brought to the attention of the Committee. While the requirements of the Act were observed with respect to this claim, we find that recovery is precluded by the limitations provisions set forth in the policy of insurance.[5]
 
 
 49
 We have already quoted the policy language but will reiterate the relevant phrase here for reference:
 
 
 50
 The total liability of the company for all damages, including damages for care and loss of services, because of Bodily Injury sustained by one or more persons as a result of any one occurrence shall not exceed the limit of Bodily Injury liability stated above.
 
 
 51
 We interpret[6] the language to mean that where one bodily injury has occurred, the per person recovery cap established by the policy is set at $250,000. Thus even assuming that the parents have a legitimate loss of services claim stemming from Candida's disfigurement, they are not entitled to monetary damages where Candida has already been awarded the policy maximum of $250,000 for the malpractice occurrence resulting in disfigurement.
 
 
 52
 We will therefore affirm the district court's conclusion that there is no subject matter jurisdiction over the Wiltshires' claim for loss of services relating to Candida's neurological damage. Also, by our interpretation of the policy, there is no claim for loss of services due to Candida's disfigurement, it being subsumed by Candida's $250,000 recovery related to the scarring. We will however vacate the district court's judgment which entered recovery of only $250,000 for Candida and in its stead we will enter a judgment in favor of Candida in the amount of $750,000.
 
 
 
 [1]
 The government contends that the parties' agreement to submit the question of the contract's meaning to the district court embodied an accord that the court's decision in this regard be unimpeachable. This agreement, argues the government, now operates to deprive us of jurisdiction to review the district court's decision. The argument is without merit. The transcript of the settlement conference makes it clear that the district court was to construe the policy as an initial matter. There was no accompanying concession, manifested by a relinquishment of appellate rights, to be forever bound by the court's determination
 
 
 [2]
 The government concedes that Candida's claims under the policy for neurological injury remain viable. Candida's claims are not untimely, as are her parents, because the Malpractice Act extends its otherwise two year statute of limitations for minors, who, under 27 V.I.C. Sec. 166d(b), have until their sixth birthday to file a claim under the Act
 
 
 [3]
 We note here again that Candida is not the insured, but rather, a party making a claim against the insured under the policy
 
 
 [4]
 We have already discussed how this untimeliness fails to affect Candida's claim for injury based upon neurological damage. See supra note 2
 
 
 [5]
 Because we are able to resolve this issue solely by construing the terms of the policy, we do not address the question of whether a loss of services claim can be premised upon a facial disfigurement such as that suffered by Candida
 
 
 [6]
 In this instance where we are discerning the meaning of the words used by the parties, we are interpreting and not construing a contract. See STV Engineers Inc. v. Greiner Engineering, Inc., 861 F.2d at 791 (Sloviter, J., dissenting)